NOT FOR PUBLICATION          [Dkt. Nos. 104, 112, 113, 114, 115]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

DELAWARE RIVERKEEPER NETWORK,
et al.,

      Plaintiffs,

        v.

SOIL SAFE, INC.,

      Defendant.

Civil No. 14-1349 (RMB/KMW)

**OPINION**

Appearances:

**Gerald J. Williams**
**Nicholas B. Patton**
**Christopher Markos**
Williams, Cuker & Berezofsky, Esqs.
1515 Market St.
Suite 1300
Philadelphia, PA 19102-1929
    *Attorneys for Plaintiffs*

**Christopher Gibson**
**Craig J. Huber**
Archer & Greiner, PC
One Centennial Square
PO Box 3000
Haddonfield, NJ 08033-0968
    *Attorneys for Defendant*

**BUMB,** United States District Judge:

THIS MATTER comes before the Court upon the filing of a motion for summary judgment filed by Defendant Soil Safe, Inc. ("Soil Safe") and a cross-motion for partial summary judgment filed by Plaintiffs Delaware Riverkeeper Network and Delaware

Riverkeeper (collectively, "DRN").  Mot. Summ. Judgment [Dkt. No. 104]; Cross-Mot. Summ. Judgment [Dkt. No. 112].  For the reasons set forth below, the Court (a) denies Soil Safe's motion for summary judgment with regard to DRN's Resource Conservation and Recovery Act ("RCRA") claim; (b) grants Soil Safe's motion for partial summary judgment on DRN's New Jersey Environmental Rights Act ("NJERA") claim; and (c) denies DRN's associated cross-motion for summary judgment.

I.   **FACTUAL BACKGROUND**

Soil Safe holds itself out to be a recycler of soil, adding cementitious and other additives to contaminated soil, along with screening and processing that soil for structural fill and engineering purposes, including remediation.  Soil Safe's Statement of Undisputed Material Facts & DRN's Responses ("First SOF") ¶¶ 1-5, 10 [Dkt. Nos. 104-2, 112-4].  Other than those high-level facts, the parties disagree about much of Soil Safe's efforts in recycling soil, and, indeed, whether it even amounts to "recycling."

Soil Safe's product, as it pertains to this case, is a low level petroleum-impacted soil that is, as set forth in the affidavit Dr. Craig Benson,[1] ICC700 National Green Building Standard Green Certified.  Benson Aff. Ex. A at App'x B [Dkt.

---

[1] Dr. Benson is the Dean of the School of Engineering at the University of Virginia.  Benson Aff. Ex. A.

No. 104-40].  The soil at issue in this case comes from Soil
Safe's Logan Recycling Center, located in Logan Township,
Gloucester County, New Jersey.  Gibson Dec. Ex. A at 2 [Dkt. No.
104-5].  Soil Safe possesses a New Jersey Department of
Environmental Protection ("NJDEP") Class B recycling permit,
which authorizes it to use recycled soil at three specific
sites: (1) the Birch Creek Site, which is owned by Soil Safe;
(2) the Logan Equine Park Site, which is owned by Gloucester
County Improvement Authority; and (3) the Gloucester County Park
site ("County Park Site"), which is owned as well by the
Gloucester County Improvement Authority.  First SOF ¶ 13.

     The County Park Site was historically contaminated because
it was used as a depository for dredge spills, among other
things.  Id. ¶ 16.  The NJDEP approved a Remedial Action
Workplan ("RAWP") for the site in November 2008, with a goal of
remediating the contamination at the site.  Id. ¶ 17; see also
Gibson Dec. Ex. B (the "County Park Site RAWP").  The County
Park Site RAWP was supported by a 14-month study and review,
with permits and approvals for the project being obtained from
the United States Army Corps of Engineers, several NJDEP units,
the Gloucester Soil Conservation District, the Gloucester County
Health Department, the Gloucester County Improvement Authority,
the Gloucester County Board of Chosen Freeholders, and Logan
Township.  First SOF ¶ 18.  In generating this review, technical

3

studies, including a full ecological inventory, a comprehensive evaluation of the product to be used at the site, and other ecological analyses, were performed. Id. ¶ 19. After approval of the County Park Site RAWP and its associated environmental analysis, shipment of Soil Safe product began in March 2009. Id. ¶ 20.

The parties disagree about much of what the County Park Site RAWP entails for the County Park Site. As the RAWP sets forth, the Site is contaminated with arsenic, lead and pesticides in the surface soil. The sub-surface soil is contaminated with metals, pesticides, petroleum hydrocarbon, polynuclear aromatic hydrocarbon ("PAH") and PCB. Finally, the groundwater is contaminated with metals. County Park Site RAWP at 8. Based upon the results of an ecological analysis of the existing conditions, Soil Safe proposed (and the County Park Site RAWP adopted), the placing of an environmental cap over portions of the County Park Site, which will permit the site to have the potential for human use. Id. at 9. As the County Park Site RAWP notes, "[t]he cap will be manufactured from Soil Safe product, a class B recyclable material that has been proven to be environmentally safe." Id. The project consists of placing three layers atop the contaminated area:

- A two-foot thick, reduced permeability cap layer between the surface contamination and the developed park lands, which serves as a base for the development of the site;

4

- A varying-thickness contouring layer, which provides lines and grades needed for site development, as well as improving the geotechnical properties of the site; and

- A minimum 12-inch thick topsoil layer, which includes seed, landscaping and wearing surfaces which will be sufficient for permanent stabilization.

Id. at 9.[2]

In conducting the remediation pursuant to the County Park Site RAWP, the soil that Soil Safe will send to the project site is sampled and analyzed at least twice before it is shipped to verify that the soil is non-hazardous.  First SOF ¶¶ 27, 28. Indeed, in order to be sent to the County Park Site after recycling at Soil Safe's Logan Recycling Facility, over 16,000 samples of soil are analyzed.  Id. ¶ 30.  The data generated by these samples are analyzed by New Jersey Certified Analytical Laboratories.  They are then submitted to an independent New Jersey Professional Engineer for certification.  Id. ¶¶ 39-40.

Soil Safe estimates that it is approximately 80 to 85% complete with the project as of April 2016.  Free Aff. ¶ 18 [Dkt. No. 104-39].  As set forth in the below analysis, this lawsuit arises from faults that DRN claims it has identified concerning Soil Safe's remediation efforts.  Specifically, the

---

[2] The proposed cap was designed to be placed on all portions of the County Park Site that would be subject to human contact, which excluded wetlands and wildlife buffer areas.  Id.  The parties disagree as to whether the term "cap" embodies the entire three-layer covering or just the two-foot remedial cap.

thrust of DRN's factual claims is that Soil Safe does not meaningfully recycle any soil that it receives and instead disposes of contaminated soil (which it argues is a solid or hazardous waste) in the name of remediation only, while violating the County Park Site RAWP and New Jersey regulations along the way.  DRN Opp. Br. at 2, 21-22 [Dkt. No. 112-2].[3]

## II.  <u>LEGAL STANDARD</u>

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  14 Fed. R. Civ. P. 56(a).  A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  <u>Id.</u>

When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all

---

[3] While not dispositive to the outcome of the summary judgment motions now pending, the Court does feel compelled to note the factual issues concerning Clean Earth, a Soil Safe competitor. Soil Safe has put forward evidence, some contested and some uncontested, that this lawsuit was spurred on by Andrew Voros, a consultant for Clean Earth.  First SOF ¶¶ 43-58.  Mr. Voros, who has been paid in excess of $100,000 by Clean Earth (a fact not disputed) to investigate Soil Safe's operations, took the information he had received about Soil Safe to the Delaware Riverkeeper Network, with whom he has interacted for purposes of pursuing this litigation.  <u>Id.</u> at ¶¶ 51, 57, 58.

reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party."  Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).  However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial.  Anderson, 477 U.S. at 252.  Further, a court does not have to adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 373, 380 (2007).  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P.

56(e)). The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995); Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009)) ("[S]peculation and conjecture may not defeat summary judgment.").

III. **ANALYSIS**

   A. **DRN's Resource Conservation and Recovery Act ("RCRA") Claim**

Soil Safe first moves for summary judgment on DRN's claim pursuant to 42 U.S.C. § 6972(a)(1)(B) of the RCRA. That portion of the RCRA states, with exceptions, any person may commence a civil action on his own behalf:

> [A]gainst any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, **who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment** . . . .

Id. (emphasis added). With regard to this provision, Soil Safe contends that the undisputed facts demonstrate its product is not a solid or hazardous waste. Further, even if it does deal

8

with hazardous or solid waste, there is not a genuine dispute of fact concerning whether that waste may present an imminent and substantial endangerment to health or the environment.  DRN disagrees on both counts.

### i. **Solid Waste**

The definitional language of this provision and others in the scheme have been called "dense, turgid, and circuitous," United States v. White, 766 F. Supp. 873, 880 (E.D. Wash. 1991), and this Court agrees.  Nevertheless, the RCRA defines "solid waste" as:

> any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility **and other discarded material**, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of Title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) [42 U.S.C.A. § 2011 et seq.].

42 U.S.C. § 6903(27) (emphasis added).[4]  Many courts have found the above statutory definition to be ambiguous, see, e.g., Ecological Rights Foundation v. Pacific Gas and Electric Co., 713 F.3d 502, 514-15 (9th Cir. 2013), and have looked to other authorities and the legislative history, discussed infra, to

---

[4] No party asserts that the solid waste analysis would proceed on any ground other than the "other discarded material" category.

resolve the ambiguity.  Id.  ("Congress enacted RCRA to 'eliminate[] the last remaining loophole in environmental law' by regulating the 'disposal of discarded materials and hazardous wastes.'") (quoting H.R. Rep. No. 94-1491(I), at 4 (1976)).

Soil Safe contends that its soil, because it is being used for purposes of environmental remediation, is not being "discarded" within the meaning of the RCRA.  As the Ninth Circuit panel noted in Safe Air for Everyone v. Meyer, "RCRA itself does not define the term 'discarded material.'"  373 F.3d 1035, 1042.  In that case, the court relied upon the dictionary definition "to cast aside; reject; abandon; give up."  Id. (quoting The New Shorter Oxford English Dictionary 684 (4th ed. 1983).  The court in Safe Air also quoted favorably the D.C. Circuit's ruling that "our analysis of [RCRA] reveals clear Congressional intent to extend EPAs authority only to materials that are truly discarded, disposed of, thrown away, or abandoned."  Id. (quoting American Mining Congress v. U.S. E.P.A., 824 F.2d 1177, 1190 (D.C. Cir. 1987)).

Likewise, as Soil Safe argues, in American Mining Congress v. U.S. E.P.A., the Court held that the use of the term discarded "calls for more than resort to the ordinary, everyday meaning of the specific language at hand."  824 F.2d at 1185. Nevertheless, the Court ultimately did adopt more-or-less that everyday meaning of discarded, which centers on the concept of

"disposal." Id. at 1186.  The Court noted that the purpose of the statutory scheme was to deal with the issue of how waste was being disposed of:

> RCRA was enacted, as the Congressional objectives and findings make clear, in an effort to help States deal with the ever-increasing problem of solid waste *disposal* by encouraging the search for and use of alternatives to existing methods of disposal (including recycling) and protecting health and the environment by regulating hazardous wastes.  To fulfill these purposes, it seems clear that the EPA need not regulate 'spent' materials that are recycled and reused in an ongoing manufacturing process.  These materials have not become part of the waste disposal problem; rather, they are destined for beneficial reuse or recycling in a continuous process by the generating industry itself.

Id.  Like Safe Air, the touchstone of American Mining's decision is the intention of the person or entity handling the materials – whether the alleged polluter is "abandoning" them or not. See, e.g., id.  ("We are constrained to conclude that . . . Congress clearly and unambiguously expressed its intent that 'solid waste' . . . be limited to materials that are 'discarded' by virtue of being disposed of, abandoned, or thrown away."). This is a common thread of interpretation of the word "discarded" throughout many of the cases cited by Soil Safe. See Oklahoma v. Tyson Foods, Inc., No. 05-CV-329-GKF-SAJ, 2008 WL 4453098, at *3-4 (N.D. Ok. Feb. 17, 2010) (holding that poultry litter, which has agricultural uses, was not being "discarded" for purposes of violating RCRA), aff'd sub nom. Att. Gen. of Oklahoma v. Tyson Foods, Inc., 565 F.3d 769 (10th Cir.

2009); Ecological Rights Found., 713 F.3d at 515-16 (holding that wood preservative being applied to telephone poles was being used for its "intended purpose" and was therefore not being discarded); Krause v. City of Omaha, No. 8:15CV197, 2015 WL 5008657, at *4-5 (D. Neb. Aug. 19, 2015) (holding that road salt was not solid waste under the RCRA because it was placed on the streets for "snow and ice control"), aff'd, 637 Fed. Appx. 257, 258 (8th Cir. Feb. 22, 2016).

The Court agrees with the above-cited opinions and legislative history that have concluded that "disposal" or "abandonment" of material is essential to the material being "discarded" for the purpose of being "solid waste." See H.R. Rep. 94-1491(I) ("At present the federal government is spending billions of dollars to remove pollutants from the air and water, only to dispose of such pollutants on the land in an environmentally unsound manner."). Congress sought to redress issues of disposal of hazardous or solid waste, not regulate the use of all materials that present environmental concerns, even if used properly for a beneficial purpose. The cases cited by Soil Safe confirm this reading of the RCRA by declining to uphold causes of action predicated on creative interpretations of the term "discard," when the record in those cases

established that the questioned materials, like poultry litter or road salt, were being used in their intended manner.[5]

On the other hand, DRN contends that contaminated soil does indeed amount to "solid waste" under the RCRA.  In so arguing, DRN relies on Zands v. Nelson for the proposition that contaminated soil can be solid waste under the RCRA.  779 F. Supp. 1254 (S.D. Cal. 1991).  That case dealt with gasoline-contaminated soil and ruled that gasoline-contaminated media is solid waste.  The Zands court so reasoned because the gasoline in the soil had been "abandoned" and the gasoline cannot be re-used or recycled.  Ultimately, that court determined that it found it difficult to believe "that Congress intended that soil and groundwater contaminated with gasoline would not be covered by RCRA simply because the contamination was caused by gasoline," even though gasoline itself is obviously not a "solid" waste.  Id. at 1262.

The court in Dydio v. Hesston Corp. reached a similar conclusion, holding that "petroleum-contaminated soil constitutes 'solid waste[.]'"  887 F. Supp. 1037, 1048 (N.D. Ill. May 22, 1995).  In that case, the defendant claimed that

---

[5] The issue before the Court is not whether the soil that Soil Safe receives at its facility is "solid waste," as that soil would likely not fit the definition of being discarded. Instead, the issue is whether the output of the soil recycling facility is being discarded or not.

13

leaking petroleum was not a "waste" product because it was a useful product.  Relying upon Zands, the Dydio court ruled that "[m]ost, if not all of these courts, have reiterated and adopted the reasoning originally set out in Zands, and today we join among them and hold that leaking petroleum is a solid or hazardous waste supporting a citizen suit under § 6972(a)(1)(B)."  Id. at 1047.

The Court finds these two veins of case law to be reconcilable.  The cases cited by Soil Safe stand for the proposition that material being used with the intention of carrying out a task is not "discarded" (and therefore not solid waste) because it is not being abandoned, while the cases cited by DRN stand for the proposition that oil or gasoline leaking into soil and groundwater is abandoned and does embody or create "solid waste" under the RCRA.  Notably, the oil or gas-laced soil present in DRN's cases was not present by any intentional purpose – it had leaked there.  Thus, the Zands and Dydio courts were not presented with the issue before this Court (or the issue before the courts in the cases cited by Soil Safe): whether soil containing petroleum, if intentionally applied for ecological remediation purposes, is being "discarded" within the meaning of the RCRA.

The Court holds that recycled, petroleum-laced soil that has undergone proper review and testing, a fact not in dispute

14

in this case, see supra at 5, is not solid waste when applied for purposes of remediation.  Nevertheless, DRN has made much at the motion to dismiss stage, and again at the summary judgment stage, of the fact that the recycling process engaged in by Soil Safe is a "sham."  Mot. Dismiss Hrg. Tr. 27:25-28:12 [Dkt. No. 22].[6]  Specifically, DRN has adduced evidence in the form of deposition testimony that Soil Safe acquires contaminated soil from other companies and adds one percent by weight CKD to the contaminated soil "knowing the addition of CKD does not alter the contaminated character of the soil."[7]  Free Dep. at 141:2-142:3.  DRN has also adduced evidence that the Soil Safe additives only create physical stabilization for improved geotechnical properties, but do not create any chemical sequestration.  Benson Aff. ¶¶ 16, 19.  Viewing this evidence in the light most favorable to DRN, an inference arises that Soil Safe does nothing to the soil to remediate it and that its true

---

[6] As noted by the Fifth Circuit in a different context, "[s]ham recycling, as opposed to legitimate recycling, occurs when the hazardous waste purportedly recycled contributes in no significant way to the production of the product allegedly resulting from the recycling. . . . In other words, the sham versus legitimate recycling inquiry focuses on the purpose or function the hazardous waste allegedly serves in the production process."  United States v. Marine Shale Processors, 81 F.3d 1361, 1365 (5th Cir. 1996).
[7] Based on DRN's theory of the case, Soil Safe engages in sham recycling by doing little to nothing to the damaged soil it receives, and then engages in sham remediation by laying that soil down.

purpose in placing it on the County Park Site is simply to abandon polluted soil and not remediate.  By a sliver, this inference permits the case to advance past summary judgment.

In other words, at summary judgment, viewing the evidence in the light most favorable to DRN, it has ***narrowly*** identified a genuine dispute with deposition testimony and other evidence that could lead a reasonable jury to find that Soil Safe is disposing of contaminated soil, while merely rubber stamping that disposal as remediation to cover up the fact that it is "discarding" it under the RCRA.[8]  Put more directly, trial of this issue will focus almost exclusively on whether Soil Safe is "putting lipstick on a pig" and has no intent to remediate with the soil, but rather is simply abandoning polluted soil with the purpose of using the RAWP to erect a Potemkin village in front of waste disposal.[9]  Should the fact finder find that the purpose

---

[8] The Court gives little credence to the parties' arguments concerning the beneficial use exemption under New Jersey law. As noted in Citizens Coal Council v. Matt Canestrale Contracting, Inc., "it is simply irrelevant whether CCB is considered waste under Pennsylvania regulations, as this Court has determined that the statutory definition of solid waste contain in . . . 42 U.S.C. § 6903(27) applies to [suits under 42 U.S.C. § 6972(a)(1)(B).]" 51 F. Supp. 3d 593, 607 (W.D. Pa. Sep. 30, 2014).

[9] It is hard to fathom that a finder of fact would find that a company that receives recycled material that has passed muster by under USEPA's Toxicity Characteristic Leaching Procedure test (as the evidence introduced by Soil Safe tends to demonstrate) engages in sham recycling or remediation.  See, e.g., Soil Safe Br. at 22-23.  Nonetheless, this is a fact-based inquiry.

of laying the soil is not to discard it, but rather to remediate the site, the case will be resolved on that finding alone with no need to advance to any other phase.[10]

### ii. **Hazardous Waste**

In its response to summary judgment, Soil Safe argues that DRN conceded its claim at the motion to dismiss stage that if the Soil Safe product is not solid waste, then it is hazardous waste under the RCRA.  DRN, on the other hand, contends that its claim that Soil Safe product is a "hazardous waste" under the RCRA remains viable.  DRN's argument grossly misstates this Court's ruling at the motion to dismiss stage.  As the Court remarked, the reason that DRN's RCRA claim survived was because DRN "averred sufficient allegations to say that it is a solid waste that is being discarded that poses a health risk and hazardous risk to the environment and humans."  Mot. Dismiss Hrg. Tr. at 33:8-15.  This ruling was in turn based on DRN's position at oral argument that it was no longer pursuing any argument that Soil Safe product is a hazardous waste.[11]  As such, the Court considers the issue to have been conceded.

---

[10] The Court does not find resolution of this issue will take more than a day of trial time.

[11] As counsel for DRN relayed to the Court at the time of oral argument at the motion to dismiss stage: "No, you don't have to get to the list[ed items for hazardous waste.]  Your Honor, that argument and the clarification that [Soil Safe] presented in [its] reply brief after we presented that in our pre motion letter was the reason we have decided to dismiss Count 1.  But,

Nevertheless, even if the claim were not conceded, there is not a genuine dispute of fact whether Soil Safe product is a hazardous waste.  DRN argues that it is a hazardous waste because it contains benzo(a)pyrene ("BaP"), a "listed" hazardous waste.  The applicable regulations designate as a hazardous waste "[a]ny residue or contaminated soil, water or other debris resulting from the cleanup of a spill into or on any land or water of any commercial chemical product or manufacturing chemical intermediate having the generic name listed in paragraph (e) or (f) of this section."  40 C.F.R. § 261.33.  The comment on that section goes on to state:

> The phrase 'commercial chemical product or manufacturing chemical intermediate having the generic name listed in . . .' refers to a chemical substance which is manufactured or formulated for commercial or manufacturing use which consists of the commercially pure grade of the chemical, any technical grades of the chemical that are produced or marketed, and all formulations in which the chemical is the sole active ingredient. It does not refer to a material, such as a manufacturing process waste, that contains any of the substances listed in paragraph (e) or (f).

40 C.F.R. § 261.33.

DRN has pointed to no evidence in the record that the BaP amounts in Soil Safe product are the result of a spill or release of a "commercial chemical product or manufacturing

---

like I said, your Honor, you only have to focus on a statutory definition and whether it's a solid waste under that.  Mot. Dismiss Hrg. Tr. 30:7-13.  He added, "Right.  It doesn't need to be hazardous waste."  Id. at 30:16-17.

chemical intermediate."  DRN instead notes that BaP is a by-product of petroleum combustion, DRN Opp. Br. 23, which would appear to clearly refute DRN's own position that it is the result of a spill.  As such, even if the issue had not been conceded, DRN has not pointed to sufficient evidence to overcome summary judgment with regard to the contention that Soil Safe product meets the definition of hazardous waste for purposes of an RCRA violation.

### iii. <u>Imminent and Substantial Endangerment</u>

Having rendered the issue of whether Soil Safe product is solid waste a very narrow question of fact, DRN also must demonstrate that Soil Safe product "may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1)(B).  In interpreting this statutory provision, the Third Circuit has noted:

> The operative word is "may" . . . .
>
> [P]laintiffs need only demonstrate that the waste . . . "may present" an imminent and substantial threat . . . . Similarly, the term "endangerment" means a threatened or potential harm, and does not require proof of actual harm . . . .  The endangerment must also be "imminent" [meaning] threatens to occur immediately . . . .  Because the operative word is "may," however, the plaintiffs must [only] show that there is a potential for an imminent threat of serious harm . . . [as] an endangerment is substantial if it is "serious" . . . to the environment or health.

Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 399 F.3d 248, 258 (3d Cir. 2005) (quoting Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1015 (11th Cir. 2004)) (alterations in original).  It must also be shown that there is a nexus between the waste and the imminent and substantial endangerment.  Id. at 257.

### 1. **Endangerment to Health**

Soil Safe argues that DRN has not demonstrated that its product may pose an imminent and substantial endangerment to health for purposes of surviving summary judgment.  DRN's argument in opposition relies exclusively on the expert opinion of Dr. Mary A. Fox.  See Gibson Dec. Ex. G ("Fox Report") at 1 [Dkt. No. 104-15].  The Court finds that Dr. Fox's findings do not create a genuine dispute of material fact with regard to the health prong.

Dr. Fox's opinion centers on increased health risks associated with BaP in Soil Safe product at the County Park Site.  Fox Report at 1.  Dr. Fox measured those risks by computing increased cancer outcomes, and determined:

> For these population scenarios with certain exposures to the averaged measured BaP soil concentrations, the cancer risk was estimated to be higher than the cancer risk identified by both the US EPA and NJDEP.[]  In particular, children with pica (those with very high soil ingestion rates) were estimated to have the highest risk, with exposures to mean BaP soil concentrations leading to an estimated 5 to 6 times the acceptable cancer risk.

Id. at 2.  Dr. Fox's ultimate conclusion was: "The concentration of BaP in the soils that Soil Safe has used to build [the County Park Site] exceed New Jersey's minimum remediation standards." Id. at 8.  This meant "for park visitors exposed to these soils this may result in cancer risks exceeding one additional cancer per million which is New Jersey's public health target for carcinogens in soil."  Id.  The referenced New Jersey public health target is the $1 \times 10^{-6}$ standard, or an additional cancer risk of one per one million people.[12]

Soil Safe argues vehemently against the legitimacy of Dr. Fox's opinion for purposes of summary judgment.  First, Soil Safe argues that Dr. Fox's opinion is mistakenly based on the wrong data and that substituting the correct data into her calculations yields a cancer rate below the threshold that Dr. Fox herself selected.  Specifically, the data upon which Dr. Fox relied was pulled from Appendix C to the County Park Site RAWP, which contains soil contaminant data from soil that Soil Safe received to be recycled, not soil that was sent to the County Park Site after being recycled by Soil Safe.  See County Park

_____

[12] This standard was derived from New Jersey statute concerning acceptable minimum remediation standards: "The department shall set minimum soil remediation health risk standards for both residential and nonresidential uses that . . . for human carcinogens, as categorized by the United States Environmental Protection Agency, will result in an additional cancer risk of one in one million."  N.J.S.A. 58:10B-12(d)(1).

Site RAWP App'x C at C-1 (explaining that the accompanying data was for soil "accepted" at the Logan facility); but see Fox Report at 2 ("Soil Safe provided a statistical summary of the concentrations of contaminants of concern in the Soil Safe product that [it] was intending to use to remediate the Gloucester County Park in Appendix C of the Remedial Action Workplan for the Gloucester County Park."). Soil Safe argues that this decision renders Dr. Fox's opinion ineffectual for establishing that the Soil Safe product used at the Gloucester County Park Site may pose an imminent and substantial health endangerment.

During her deposition, Dr. Fox did not deny that she had made a "mistake" considering the RAWP data as representative of the product used at the Gloucester County Park Site. Gibson Dec. Ex. H at 124:10-15. Indeed, at her deposition, Dr. Fox seemed genuinely confused as to what data she analyzed and whether that data represented remediated soil.[13] Further

---

[13] For example:

> Q: What I'm asking you about your understanding of the remedial action work plan is whether the soil that was sampled is also known as remediated soil?
> A: Well, I don't know.  I don't know.  We looked at the samples that were in the remedial action work plan, which characterizes the contaminants in the Soil Safe product.
> Q: When you say "Soil Safe product," is that synonymous with remediated soil?
> A: I don't know.

confounding the legitimacy of DRN's expert's findings, Soil Safe's expert, Dr. Janet Kester, used both DRN stockpile sampling data and Soil Safe Product sampling data and plugged them into Dr. Fox's otherwise-unchanged calculations.  Kester Aff. ¶ 33, Ex. B at 26-27 [Dkt. No. 104-41].  Doing so yielded no theoretical increased cancer risk estimates for BaP above the $1 \times 10^{-6}$ threshold that Dr. Fox has selected.  <u>Id.</u>

The Court holds that Dr. Fox's opinion does not render the issue of imminent and substantial endangerment of health to be in genuine factual dispute.  While the Court is not permitted to weigh evidence at summary judgment, and does not do so to reach this holding, Dr. Fox's findings simply do not put into dispute the harm posed by the soil that was actually used in remediation, as alleged in this case.  Put differently, Dr. Fox analyzed the wrong data.  Her analysis does not demonstrate that the BaP present in the Soil Safe product poses a potential endangerment to human health because she did not analyze Soil Safe product that was sent to the Gloucester County Park.

---

Q: You don't know.  Do you know whether remediated soil was sent to the Gloucester County Park?
A: I don't know.

<u>Id.</u> at 124:16-125:5.

Moreover, even if as DRN contends, its theory of the case that Soil Safe does not meaningfully recycle the soil is true, DRN has not disputed that plugging in other, accurate numbers to Dr. Fox's calculations does not reach the threshold Dr. Fox herself suggested.  Further, while Dr. Fox was not required to adopt any particular increased cancer risk threshold to create a genuine issue of fact under the RCRA, including the $1 \times 10^{-6}$ threshold she did select, the Court finds the record is devoid of any other means by which it might determine the cancer risk posed by Soil Safe product is serious.  The natural implication of DRN's unadorned argument is that any marginal increase in the risk of cancer, even an infinitesimally remote one, creates an issue of fact sufficient to survive summary judgment.  DRN Opp. Br. 37-38.  This would be an unacceptably broad standard without more record evidence to substantiate it, even under the RCRA's expansive view.

As such, even viewing the evidence in the light most favorable to DRN, there is insufficient evidence in the record to conclude that Soil Safe product "may present an imminent and substantial endangerment to health . . . ."  42 U.S.C. § 6972(a)(1)(B).  As such, DRN cannot survive summary judgment on this prong of the RCRA "imminent and substantial endangerment" analysis.

2. **Endangerment to Environment**

Having failed to survive summary judgment by demonstrating that Soil Safe product may present an imminent and substantial endangerment to health, DRN also argues that there is a genuine issue of fact concerning environmental endangerment.  In opposition to summary judgment, DRN relies upon the expert opinions of Drs. Tucker and Cristini, as well as proffered expert hydrogeologist Vincent Uhl.

In their joint expert report, Drs. Tucker and Cristini concluded from samples taken at the nearby Birch and Raccoon Creeks that there was substantial contamination with "PAHs, PCBs, dioxins and dibenzofurans, as well as heavy metals." Gibson Dec. Ex. J ("Tucker/Cristini Report") at 1 [Dkt. No. 104-18].  Analyzing this data, they concluded that this contamination in the water represents a substantial and imminent ecological danger "because of the wide range of chlorinated organic and metal contaminants found in samples adjacent to Birch and Raccoon Creeks; their likelihood of persisting in the aquatic environment; and their adverse effect on the biota." Id. at 4.  While these experts tersely postulated that Soil Safe product could be the source of the contamination, id. at 1, they do not detail that speculation in their report.

Soil Safe has a series of contentions that these expert reports are insufficient to survive summary judgment:  the

25

results are marginal or non-rigorous; the experts did not undertake an Ecological Risk Assessment pursuant to NJDEP technical guidance; and exceedance of screening criteria does not amount to imminent and substantial endangerment. Soil Safe Br. at 29-32 [Dkt. No. 104-1]. While many of Soil Safe's concerns appear to be potentially valid in determining the weight to be given to such an expert report, such as the limited sampling protocol and the failure to measure background levels, the Court is not permitted to weigh the evidence at this stage. As such, DRN – if by the slimmest of margins – has adduced sufficient evidence to withstand summary judgment by demonstrating that the contaminants may present an imminent and substantial endangerment to the environment.

### 3. Nexus

Having narrowly demonstrated a dispute of fact that the contaminants may present an imminent and substantial endangerment to the environment, DRN must also show a nexus between that endangerment and the defendant. "RCRA expressly specifies there is no liability without a causal relationship between a defendant and an imminent and substantial endangerment." U.S. v. Hardage, 116 F.R.D. 460, 466 (W.D. Ok. 1987).

Soil Safe argues that DRN has not shown a causal relationship or nexus because the opinions of Drs. Tucker and

Cristini do not actually establish that the environmental threats embodied by the contaminants in the water could have been caused by Soil Safe.  In further support, Soil Safe points to Tyson Foods, a case in which the court held that where the defendants spread poultry feces over soil, and bacteria ended up in the Illinois River Watershed, a preliminary injunction should not issue against the defendants because "[t]he evidence produced to this Court reflects that fecal bacteria in the waters of the IRW come from a number of sources, including cattle manure and human waste from growing numbers of human septic systems in that area's karst topography."  Oklahoma, 2008 WL 4453098, at *4.  Soil Safe contends that here, too, DRN cannot "demonstrate that material from Soil Safe's operations is the source of the ubiquitous contaminants detected in the three Birch Creek/Raccoon Creek off-site sediment samples."  Soil Safe Br. at 33.  Soil Safe further contends that the only potential evidence that purports to show a causal link between it and the water contamination are sediment samples and the testimony of environmental consultants who collected them, but who did not investigate background contaminant levels.  Further, even if that evidence were meaningful to the analysis, that causal relationship would be based on proximity alone, which Soil Safe argues is insufficient under Tyson Foods.

27

In response, DRN argues that the expert opinion of Vincent Uhl, their "expert hydrogeologist" involved in off-site sampling puts the issue of causation into genuine dispute.  DRN Opp. Br at 31.  Mr. Uhl's goal, as he testified in his deposition, was to "sample off-site sediments at the end market site, . . . in surface water pathways to Raccoon Creek."  Williams Cert. Ex. Q at 95:8-10.  From that data, Mr. Uhl was able to testify of his belief that the off-site sediment samples, which contained extensive contaminants, Gibson Dec. Ex. I at Table 4, were a result of Soil Safe product.  Williams Cert. Ex. Q at 96:8-12.

The Court finds that DRN has pointed to a genuine issue of fact with regard to whether there is a nexus between the imminent and substantial endangerment and Soil Safe's activity on the site.  As an initial matter, Tyson Foods is distinguishable.  That case dealt with whether to issue a preliminary injunction to enjoin the conduct of the defendants.  The matter is before this Court on summary judgment and the Court is required to consider the evidence in the light most favorable to DRN and abstain from weighing the evidence.  As such, many of Soil Safe's concerns, which strike the Court as fertile ground for cross-examination of Mr. Uhl and DRN's other experts, go to the weight of the evidence to be given his opinion, not the existence of a dispute of fact created by that opinion.  Mr. Uhl has offered deposition testimony attributing

the contamination to Soil Safe.  Williams Cert. Ex. Q at 96:8-11 [Dkt. No. 112-25].[14]  To the extent a nexus cannot be established based on proximity, Mr. Uhl also testified that it was not proximity alone underlying his opinion, but that it was also based on the lack of vegetation in certain areas since 2009. Id. 96:21-98:13.  While Mr. Uhl's limited sampling and reasoning are open to legitimate criticism, summary judgment is not the time.  As such, although only very narrowly, DRN has pointed to sufficient evidence to stave off summary judgment with regard to its RCRA claim.[15]

## B. **DRN's New Jersey Environmental Rights Act Claim**

Both parties move for summary judgment on DRN's claim for violation of the NJERA.  Under the NJERA, citizens are permitted to "commence a civil action in a court of competent jurisdiction

---

[14] That deposition excerpt reads:

> Q: Does that mean that the sediment that you're looking at you believe to be Soil Safe's product?
> A: Yes.
> Q: Okay.  And is that based upon the sampling data or is that based upon visual?
> A: It's based upon the drainage area – focusing on RC SED-1, the drains to the piped outlet.

Id. at 96:8-16.

[15]  The Court believes resolving the environmental endangerment and nexus issues will, again, require no more than a day of trial time.  It may not be necessary, indeed, to even make use of this day if the finder of fact determines that the Soil Safe product is not solid waste, as discussed supra, in the first phase.

against any other person alleged to be in violation of any statute, regulation or ordinance which is designed to prevent or minimalize pollution, impairment or destruction of the environment." N.J.S.A. 2A:35A-4. DRN's cause of action centers on several alleged deviations by Soil Safe from the RAWP or regulations, specifically: (i) violation of the BaP limits permissible in the soil, and (ii) violation of the cap thickness requirements.

With regard to the BaP contaminant requirements, it is undisputed by the parties that the levels of BaP in Soil Safe's product fall below the requirements of the Residential Direct Contact Soil Cleanup Criteria ("RDCSCC") which governed prior to June 2, 2008, but are at times above the criteria adopted after June 2, 2008, the Residential Direct Contact Soil Remediation Standards ("RDCSRS"). The parties agree the BaP standard for the RDCSCC is .66 mg/kg and the RDCSRS standard is .2 mg/kg. Soil Safe Br. at 37; DRN Opp. Br. at 9. Instead, the parties argue over the relevant standard governing the Soil Safe product, the more lenient RDCSCC or the more stringent RDCSRS.

A grandfathering provision, N.J.A.C. § 7:26E-1.5(c)(2), governs the appropriate remediation standard for the soil (hereinafter, "Section 1.5(c)(2)"). Section 1.5(c)(2) indicates that:

> (c)   The   person   responsible   for   conducting   the remediation of a site shall remediate:
>
>> 1.  To  comply  with  the  Remediation  Standards, N.J.A.C. 7:26D; or
>>
>> 2.  To  comply  with  the  standards  or  criteria developed by the Department under N.J.S.A. 58:10B-12a for that site prior to June 2, 2008, provided:
>>
>>> i. A remedial action workplan or a remedial action report containing standards or criteria developed for the site under N.J.S.A. 58:10B-12a was submitted to the Department before December 2, 2008;
>>>
>>> ii. The remedial action workplan or a remedial action report meets the requirements of N.J.A.C. 7:26E-5.5 or 5.7, respectively, and is approved as written by a licensed site remediation professional; and
>>>
>>> iii. The standards or criteria developed by the Department under N.J.S.A. 58:10B-12a for the site are not greater by an order of magnitude than the remediation standards otherwise applicable under N.J.A.C. 7:26D.

Id. DRN does not contend that the County Park Site RAWP does not qualify for Section 1.5(c)(2) treatment, at least generally. Instead, DRN presents a series of arguments that the RDCSRS standard applies to all or portions of the Soil Safe product despite Section 1.5(c)(2). As outlined below, the Court disagrees with DRN.

DRN's first argument is that because BaP is not listed as a contaminant of concern in the County Park Site RAWP, Section 1.5(c)(2), which only provides repose for "standards or criteria" developed for the site, does not apply. DRN cites no

31

authority for this position, and it is not a limitation that is
found in Section 1.5(c)(2), which simply indicates that
remediation must be carried out to specific standards, but does
not indicate that remediation efforts must be limited to RAWP-
identified contaminants.  Moreover, DRN's contention that BaP
was not cited as a potential contaminant for remediation is
incorrect.  The County Park Site RAWP notes that one area of
concern is "AOC G – Historic Fill."  County Park Site RAWP at
12.  Under NJDEP regulations, Historic Fill is presumed to be
contaminated, and NJDEP regulations in effect at the time of the
RAWP identified default contaminants of concern in Historic
Fill, including BaP.  Id. at 30.  As such, DRN has not
demonstrated a cause of action under the NJERA for this reading.

DRN's second argument that Soil Safe has violated the RAWP
fares no better.  DRN argues that Section 1.5(c)(2) only
regulates contaminant levels for the soil to be remediated, not
determining the applicable standards for materials brought on to
the site as part of remediation.  This argument is unsupported
by any authority cited by DRN and is inconsistent with a plain
reading of Section 1.5(c)(2).  That Section requires simply that
a remediating party comply with NJDEP remediation standard in
effect at the time, the RDCSCC standard.  As Soil Safe points
out, "there is no part of [Section 1.5(c)(2)] that suggests that
its mandate for compliance with NJDEP remediation standards does

32

not apply to materials brought onto a site." Soil Safe Rep. Br. at 24 [Dkt. No. 116].[16]

DRN's third argument is that, even if the less-stringent RDCSCC standard did apply to some portion of the remediation (the two-foot cap at the County Park Site), it did not apply to the contouring layer or the topsoil layer. DRN relies for this argument on a sentence from a letter from the NJDEP to the Gloucester County Improvement Authority indicating that the County Park Site RAWP had been approved, which reads: "Any additional Soil Safe material distributed at the site in excess of the 2-foot cap will be viewed as construction or redevelopment based, rather than a remediation requirement." Gibson Dec. Ex. W at 1-2. DRN argues that this sentence conveys the notion that only the two-foot capping layer was a remediation effort for purposes of Section 1.5(c)(2), and the Soil Safe product above the bottom two feet of the cap would be governed by the more stringent RDCSRS standards. In the deposition of the Gloucester County Improvement Authority's drafter of the County Park Site RAWP, Mr. Free testified that to avoid reimbursement issues, NJDEP limited the amount of

---

[16] While certainly not determinative, the Court also feels compelled to note the evidence Soil Safe has pointed to that the NJDEP is well-aware of and unconcerned with the Soil Safe product's adherence to the RDCSCC standard. See Soil Safe Rep. Br. at 22-23.

potential reimbursement by stating that only the first two feet
of the cap would count as remediation.  It was not included to
set different remediation standards for the cap and the rest of
the work in abrogation of Section 1.5(c)(2).  Gibson Dec. Ex. DD
at 21:7-22:23.  DRN points to no other corroboration for its
reading of the NJDEP letter as a substantive change to the
remediation plan embodied by the County Park Site RAWP,[17] and the
sentence by itself does not rise above a scintilla of evidence
that a different remediation standard would apply to the
contouring and topsoil layers.[18]

---

[17] The Court is unpersuaded by the NJDEP letter's language that
"topsoil shall meet unrestricted soil standards."  Gibson Dec.
Ex. W.  DRN's argument that this language implies that RDCSRS
standards govern, DRN Opp. Br. at 11-12, simply does not carry
any more water than its argument that nothing but the 2-foot cap
was a remediation effort.
[18] The Court is also unconvinced that Soil Safe "has exceeded the
permissible thickness of its cap" as allowed under the RAWP at
either the County Park Site or the Birch Creek Site.  DRN Opp.
Br. at 19.  DRN contends that, because the contouring material
is identical to the capping material, Soil Safe has exceeded the
two-foot cap requirement of the RAWP.  This is simply a
misreading, or perhaps a tortured reading, of the County Park
Site RAWP, which states that, like the cap materials, the
"contouring layer materials will also be recycled product
manufactured at Soil Safe's Logan facility."  County Park Site
RAWP at 36.  The "differences" between the contouring layer and
the cap layer that DRN identifies in the RAWP are not
differences in the intended material to be put down but rather
the purpose of the cap layer versus the contouring layer.
Nothing in that description implies that the materials will be
different, just that their purpose in that layer might be
different.  DRN Opp. Br. at 15 n.3.  Likewise, the addition of a
gradient at the Birch Creek Site in accordance with the
specifications of the remediation design, which required
placement of material above the five-foot cap contained in the

34

Finally, the Court is also unconvinced by DRN's argument
that Soil Safe placed soil contaminated in excess of "even the
pre-2008 RDCSCC at the Logan facility."  DRN Opp. Br. at 14.
DRN relies for this argument on the 2008 RAWP Appendix C data
regarding the soil received by Soil Safe discussed supra.  DRN
contends that, because Soil Safe – as DRN sees it – does little
to meaningfully alter the level of BaP contamination in the end
product and does not chemically sequester the contaminants in
the final product, the soil deposited at the Logan facility must
exceed the RDCSCC.  While this argument may make a genuine issue
of whether the soil constitutes solid waste, supra, it does not
rise above the speculative scintilla of evidence that the soil
deposited exceeded the BaP requirements of the more lenient
RDCSCC.

DRN provides a string of novel, but ultimately unsupported,
theories suggesting that Soil Safe violated the NJERA.  The
parties' arguments make clear the issue is the interpretation of
Section 1.5(c)(2), not any material fact.  See, e.g., DRN Opp.
Br. at 8 ("The issue presented on Count III, then, simply is
whether the material Soil Safe placed at GCP exceeds the

_____

RAWP and was authorized and approved by the NJDEP, does not
amount to a cause of action under the NJERA.  Moreover, DRN does
not appear to have presented a response to Soil Safe's motion
for summary judgment on this issue, Soil Safe Br. at 35, in its
opposition briefing, which discusses very little of the Birch
Creek Site and nothing of DRN's RAWP or gradient needs.

applicable regulatory limit for BaP, and whether Soil Safe has
exceeded the cap thickness permitted for GCP.")   Having
determined that Section 1.5(c)(2) requires the application of
the RDCSCC standard to the material used by Soil Safe, and that
there is not a genuine dispute that these standards were
exceeded, the Court determines that summary judgment in favor of
Soil Safe is proper on DRN's NJERA claim.

## IV.  <u>CONCLUSION</u>

Having considered the contentions of the parties, and for
the reasons set forth above, the Court DENIES Soil Safe's motion
for summary judgment with regard to DRN's RCRA claim.  The Court
additionally GRANTS Soil Safe's motion for summary judgment on
DRN's NJERA claim and DENIES DRN's cross-motion for summary
judgment on the same claim.

The Court also takes this opportunity to provide a brief
roadmap given the current disposition of the case.  Genuine
disputes of fact will be tried, with the first – whether the
Soil Safe product is a solid waste – taking approximately one
day.  If necessary, the second – whether Soil Safe's product may
present an imminent and substantial endangerment to the
environment (and the nexus requirement) – taking approximately
one day.  With regard to the now-pending motions to preclude
testimony by Mr. Uhl and Drs. Cristini, Tucker, and Fox, [Dkt.
Nos. 113, 114, 115], the Court will ADMINISTRATIVELY TERMINATE

these motions pending a status conference to address how the

Court may best resolve these motions in the context of a two-

phase trial.


DATED: November 30, 2016



                                        s/Renée Marie Bumb
                                        RENÉE MARIE BUMB
                                        UNITED STATES DISTRICT JUDGE